**WOMEN INVOLVED IN FARM ECONOMICS**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, et al., Appellants.**

**No. 88–5192.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 7, 1989.

Decided June 2, 1989.

John Facciola, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates, R. Craig Lawrence and Michael J. Ryan, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellants.

Mitchell F. Dolin, with whom J. Michael Hemmer, Washington, D.C., was on the brief, for appellee.

Before RUTH BADER GINSBURG, SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Nearly two decades ago, Congress enacted a per-person limitation on certain payments made to producers under the Agricultural Adjustment Act of 1938 and the Agricultural Act of 1949, as amended, 7 U.S.C. §§ 1281–1469 (1982 & Supp. V 1987). *See* Agricultural Act of 1970, § 101(1), 84 Stat. 1358, 1358 (1970). In the original payment limitation bill and in subsequent reenactments, Congress delegated to the Secretary of Agriculture the task of promulgating regulations defining the term "person." *See, e.g., id.* § 101(4), 84 Stat. at 1359; 7 U.S.C. § 1308(5) (Supp. V 1987). Those regulations, following closely on the heels of the 1970 Act, provided, *inter alia,* that husbands and wives would be treated as one person for purposes of the payment limitation. 35 Fed.Reg. 19,339, 19,340 (1970). This irrebuttable "husband-wife rule" governed farm support payments through the 1988 crop year. *See* 7 C.F.R. § 795.11 (1988) (version of regulation in effect for 1988 crop year).

Women Involved in Farm Economics ("WIFE"), representing a "national membership of women involved in farming and agriculture," filed this action challenging the husband-wife rule as violative of both the Administrative Procedure Act and the Fifth Amendment. The district court found merit in both objections, and entered an order permanently enjoining the Agriculture Department from enforcing the husband-wife regulation. *WIFE v. Dep't of Agriculture,* 682 F.Supp. 599, 608 (D.D. C.1988). We reverse.

I.

Through a variety of complex economic incentives—price and income supports and acreage controls among them—Congress has attempted to stabilize crop production, commodity prices, and farm income in a market that Congress believed would be subject to volatile swings in supply and price if left unregulated. In 1970, reacting to harsh public criticism of the large sums of money received by farmers through agricultural support programs, Congress reauthorized these mechanisms but, for the first time, imposed a per-person limitation on payments from certain farm support programs. *See* Agricultural Act of 1970, § 101(1), 84 Stat. at 1358. Originally pegged at $55,000, *id.,* the payment limitation has fluctuated in the course of periodic congressional reviews of farm support programs; the payment limitation in effect when this case was brought—governing payments for the 1988 crop year—stood at $50,000. *See* 7 U.S.C. § 1308(1) (Supp. V 1987).[1]

The 1970 statute, as noted, required the Secretary to "issue regulations defining the term 'person' and [also to prescribe] such rules as he determine[d] necessary to assure a fair and reasonable application of [the payment] limitation." Agricultural Act of 1970, § 101(4), 84 Stat. at 1359; *see* 7 U.S.C. § 1308(5) (Supp. V 1987). A scant three weeks after receiving this mandate,

---

**1.** For each of the 1987 through 1990 crops, the total amount of deficiency payments ... and land diversion payments that a person shall be entitled to receive under one or more of the annual programs established under the Agricultural Act of 1949 (7 U.S.C. § 1421 *et* *seq.*) for wheat, feed grains, upland cotton, extra long staple cotton, and rice may not exceed $50,000.
7 U.S.C. § 1308(1) (Supp. V 1987). Deficiency payments ensure that farmers are able to recover an established target price for certain crops, while diversion payments are made to induce farmers not to grow certain supply-sensitive crops.

the Secretary issued regulations implementing the Act generally and defining the term "person" for purposes of administering the payment cap. *See* 35 Fed.Reg. 19,339 (1970). The regulations provided that

> the term "person" shall mean an individual, joint stock company, corporation, association, trust, estate, or other legal entity. In order to be considered a separate person for the purpose of the payment limitation, in addition to the other conditions of this part, the individual or other legal entity must
>> (a) Have a separate and distinct interest in the land or crop involved,
>> (b) Exercise separate responsibility for such interest, and
>> (c) Be responsible for the cost of farming related to such interest from a fund or account separate from that of any other individual or entity.

35 Fed.Reg. at 19,340; *see* 7 C.F.R. § 795.3(b) (1988). Individual partners forming a partnership or joint venture, or a corporation and its separate stockholders, could therefore qualify for treatment as separate persons provided they satisfied the separate interest and responsibility criteria specified in the regulation. *See id.* But the regulation deemed a husband and wife to be one person regardless of their separate interests and responsibilities. *See* 35 Fed.Reg. at 19,340; 7 C.F.R. § 795.11 (1988). As a corollary, related regulations provided that any minor children in the marital household would not ordinarily be able to qualify as separate persons. *See* 35 Fed.Reg. at 19,340; 7 C.F.R. § 795.12 (1988).[2] These regulations remained in effect without material alteration through the institution of this lawsuit. *See* 7 C.F.R. §§ 795.3, 795.11, 795.12 (1988). In late 1987, Congress codified the husband-wife

rule in most of its applications, but directed that the Secretary of Agriculture modify the rule to provide that

> [for] any married couple consisting of spouses who, prior to their marriage, were separately engaged in unrelated farming operations, each spouse shall be treated as a separate person with respect to the farming operation brought into the marriage by such spouse so long as such operation remains as a separate farming operation, for the purposes of the application of the limitations under this section.

Pub.L. 100–203, § 1303(a)(2), 101 Stat. 1330, 1330–16 (1987). The regulations stemming from Congress' 1987 amendments, which have since been published by the Secretary, *see* 53 Fed.Reg. 29,552, 29,-576 (1988) (to be codified at 7 C.F.R. § 1497.19), were not challenged in this case.

WIFE brought this action challenging the original regulation on administrative law, equal protection, and due process grounds. The district court granted WIFE's motion for summary judgment, holding that the regulation was irrational and thus unconstitutional. Although the court acknowledged that strict scrutiny was inappropriate because the regulation did not "directly and substantially interfere[ ]" with the fundamental right to marry, 682 F.Supp. at 601 (quoting *Zablocki v. Redhail*, 434 U.S. 374, 387, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978)), the court nevertheless believed the regulation unrelated to any legitimate governmental interest considered by Congress when it enacted the farm support programs. Congress' interests in establishing a limitation on payments to farmers, according to the court, were limited to encouraging maximum participation in agricultural stabilization ef-

---

**2.** The regulations then permitted (and presently allow) a minor child, in narrow circumstances, to qualify as a separate person if he owns and operates a farm without the collaboration of his parents. In order to qualify, though, the minor must either (1) be "represented by a court-appointed guardian who is required by law to make a separate accounting for the minor[, provided] ownership of the farm is vested in the minor," 7 C.F.R. § 795.12(a)(1) (1988); (2) "es-

tablish[ ] and maintain[ ] a different household from his parents or guardian and personally carr[y] out the actual farming operations for which there is a separate accounting," *id.* § 795.12(a)(2); or (3) possess "a farming operation resulting from his being the beneficiary of an irrevocable trust[, provided] ownership of the property is vested in the trust or the minor." *Id.* § 795.12(a)(3).

forts and "to insur[ing] that the crop subsidy program [was] fairly and reasonably applied." *Id.* at 604. The court thought the regulation fundamentally at odds with these legitimate concerns because it both discouraged participation and resulted in an unfair allocation of crop subsidies.

The Government's argument that the economic efficiencies of the marital household justified the regulation was rejected by the court with the observation that "the Secretary has seen fit to not make such stereo-typical assumptions with regard to other economically dependent entities" by allowing members of partnerships and the like to qualify separately. *Id.* at 605. The court also rebuffed the government's explanation that the regulation prevented married couples from evading the payment limitation, or at least enabled the Secretary to avoid the administrative burden of distinguishing between legitimate and illegitimate claims by married persons seeking separate payments. The Secretary offered no reason for singling out married couples as potential sources of evasion, nor did he offer, according to the court, an adequate explanation as to why the program's eligibility criteria—used for ordinary partnerships—could not be employed to analyze claims filed by married farmers. *Id.* Finally, the district judge seemed persuaded that wealthy farm couples could circumvent the husband-wife rule by creating corporations that would qualify as independent "persons" under the regulations, foisting "the burden of the rule[ ] on those farmers least financially capable of maintaining their farms without it." *Id.* at 606. This, said the court, was precisely the indicium of irrationality the Supreme Court found troubling when it struck down the food stamp program's restrictive definition of "household" in *Department of Agriculture v. Moreno,* 413 U.S. 528, 538, 93 S.Ct. 2821, 2827, 37 L.Ed.2d 782 (1973). *See WIFE,* 682 F.Supp. at 606.

The district court's view of Congress' purpose in enacting the 1970 payment limitation led it to conclude the Secretary's rule was inconsistent with the statute as well, despite the fact that the rule survived nearly 20 years without congressional protest. Congress directed a "fair and reasonable" interpretation of the term "person" "to *encourage* participation in the farm crop subsidy program," *id.* at 607 (emphasis added), and because the husband-wife rule discouraged participation, the district court determined the regulation to be based on an impermissible construction of the statute.[3]

## II.

### A.

We look first to appellee's claim that the regulation is not authorized by the statute. *See, e.g., Jean v. Nelson,* 472 U.S. 846, 857, 105 S.Ct. 2992, 2998, 86 L.Ed.2d 664 (1985) (federal courts are obliged "to avoid constitutional adjudication except where necessary"). That question, of course, turns on whether the Secretary's definition of person—which includes the husband-wife rule —is a legitimate interpretation of the statute. The district court expressed concern over the failure of the Secretary to produce either a *contemporaneous* administrative record of the deliberations that preceded publication of the husband-wife rule in 1970, or a *contemporaneous* statement of the rule's central rationale, so as to aid the court in evaluating the Secretary's statutory interpretation. The court observed that "[i]n the absence of a record explaining the agency's reasoning behind promulgating the regulation, it is difficult to discern its rationality." *WIFE,* 682 F.Supp. at 607. The *post-hoc* "rationalizations" of the Secretary (offered by counsel) were thought inadequate. *See id.* (citing *Motor Vehicle Manufacturers Ass'n, Inc. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d

---

**3.** The injunction entered below affected crop subsidy payments only for the 1988 crop year; as we have noted, *see supra* p. 996, for crop years 1989 and beyond, Congress codified a modified version of the husband-wife rule into law. While the Secretary has already made payments for 1988 under the terms of the district court's injunction, we were told at oral argument that he has contractually reserved the right to recover "excess" sums if the Department is successful in this appeal. We thus are presented with a live case.

443 (1983)). We are less troubled by this alleged shortcoming, however, and believe that, in the unusual circumstances in which this challenge arises, the representations of counsel may at least be given some weight in our inquiry into the rule's consistency with the statute.

■■■ We think it useful to sketch the legal environment in which the Secretary first implemented the payment limitation in 1970, for it illustrates that the question we must resolve has implications that go far beyond this case. The husband-wife rule was promulgated in 1970 under an explicit exception to the Administrative Procedure Act's requirement that published rules be accompanied by a "concise general statement of their basis and purpose." 5 U.S.C. § 553(c) (1982). Because the rule concerned "a matter relating to ... public ... benefits," *id.* § 553(a)(2), none of the procedural requirements of section 553 was applicable. It was only *after* publication of the challenged regulations that the Department of Agriculture voluntarily disavowed section 553's exception, *see* 36 Fed.Reg. 13,804 (1971), agreeing for the future to comply with notice and comment requirements. At the time the regulation was first promulgated, however, the Secretary complied with all relevant procedural requirements of the Administrative Procedure Act. Were "the issue [solely] one of compliance with the procedural requirements of the APA, rather than with the substantive mandate of [the] enabling legislation," inquiry into the husband-wife rule's statutory validity would end here. *Baylor Univ. Med. Ctr. v. Heckler,* 758 F.2d 1052, 1060 (5th Cir.1985).

Of course, an exemption from section 553 does not insulate a rule from substantive judicial review, *see* 5 U.S.C. §§ 701, 706 (1982), and we recognize that *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), requires agencies to generate an administrative record after litigation commences to facilitate such substantive review irrespective of whether sections 553 or 554 of the Administrative Procedure Act required a record (or a contemporaneous statement)

prior to effecting the challenged action. *Id.* But to require a *contemporaneous* explanation for the rule when the APA specifically exempted the agency from an obligation to provide it is not open to a reviewing court. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Holy Cross Hosp.–Mission Hills v. Heckler,* 749 F.2d 1340, 1346 (9th Cir.1984); *St. Joseph Hosp. v. Heckler,* 570 F.Supp. 434, 437–40 (N.D.Ind.1983).

The district court has some leeway in determining the scope of an adequate record to permit review of informal agency action or, as in this case, a regulation properly issued without a statement of its basis and purpose. *See Occidental Petroleum Corp. v. SEC,* 873 F.2d 325, 337, 338–39 (D.C.Cir.1989). If, for instance, the district court had demanded an affidavit from the Secretary to assure the court that all of counsel's explanations for the adoption of the rule in 1970 were authorized by the present Secretary, we assume *arguendo* that the court would not have abused its powers. The district court actually did so with respect to the Department's claim that the cost to the government of abolishing the husband-wife rule would be substantial. Paradoxically, despite its concern, the district court did not ask for any further Departmental affirmation of counsel's explanations. Instead, as we read the court's opinion, it actually assumed that counsel's explanations accurately represented the Department's view of the reasons for adopting the rule in 1970. We think that the district court was, as are we, entitled to rely on counsel's explanations without seeking a supporting affidavit from the Secretary.

To be sure, *SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943), ordinarily prevents agency counsel from proffering alternative theories—not explicitly embraced by a department or agency head—to support a challenged regulation; to permit that risks *judicial* "intru[sion] upon the domain which Congress has exclusively entrusted to an administrative agency." *Id.* By adopting a specific

argument in support of agency action offered by counsel in the litigating process—but not relied on by the agency—the courts might actually restrict improperly the agency's future freedom of action to make policy under a particular statute. And in the swirl of litigation it is sometimes not entirely clear whether an argument that appeals to a court was actually presented in quite the fashion the court perceives. Thus, the Supreme Court has repeatedly insisted that at least when an agency had an obligation to explain its action contemporaneously with the action, *post-hoc* rationalizations of counsel may not be relied upon by a reviewing court. *See, e.g., Motor Vehicle Mfrs. Assn. v. State. Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983); *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962).

But, if an agency had no obligation to explain its actions contemporaneously, somewhat different considerations apply. In these circumstances, the entire record, or a good part of it, is actually created for the sole purpose of judicial review; by definition, much that is presented to the court is developed *post-hoc.* Typically, any challenges to the agency's action will follow soon after the action is taken so the explanation given to the court can be presented by those agency officials who directed the agency action. A court may well determine that the representations of counsel require buttressing by affidavits submitted by the officials who took the action, *see Overton Park,* 401 U.S. 402, 91 S.Ct. 814; however, when a court does so it acts out of somewhat different concerns than those that underlie *Chenery.* Typically, when an agency is entitled to act without expressing its reasons it is not engaged in a law/policymaking function. There is therefore little risk that a reviewing court, by accepting counsel's *post hoc* explanations, will encroach upon that role. In this setting the court is primarily concerned that, insofar as it is practicable, the actual reasons for the agency's action—presumably best expressed by the agency head—be barred for judicial scrutiny to determine whether

the agency acted with an unlawful motive. We are thus aware of no case in which the Supreme Court has applied *Chenery*'s proscription against crediting counsel's explanations to the review of agency action exempt from the APA's requirement of a contemporaneous explanation of the action's basis or purpose. *See Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983) (rulemaking subject to notice and comment procedures); *American Textile Mfrs. Inst. v. Donovan,* 452 U.S. 490, 537, 101 S.Ct. 2478, 2504, 69 L.Ed.2d 185 (1981) (rulemaking for which 29 U.S.C. § 655(e) required statement of reasons); *NLRB v. Yeshiva Univ.,* 444 U.S. 672, 685 n. 22, 100 S.Ct. 856, 864 n. 22, 63 L.Ed.2d 115 (1980) (formal adjudication); *Investment Co. Inst. v. Camp,* 401 U.S. 617, 628, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971) (rulemaking conducted under notice and comment procedures); *Federal Power Comm'n v. Texaco, Inc.,* 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974) (formal adjudication); *NLRB v. Metropolitan Life Ins. Co.,* 380 U.S. 438, 443–44, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965) (same); *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 167 & n. 15, 83 S.Ct. 239, 245 & n. 15, 9 L.Ed.2d 207 (1962) (same); *cf. Bowen v. Georgetown Univ. Hosp.,* —— U.S. ——, 109 S.Ct. 468, 473–74, 102 L.Ed.2d 493 (1988) (declining to give *Chevron* deference to "agency litigation positions" in review of notice and comment rulemaking).

Where—as here—the basis for a regulation issued nearly twenty years ago is brought into question, the agency's principal litigation task is essentially historical. It is possible, perhaps likely, that no one presently in the agency has any better knowledge of the exact reasons that underlay the adoption of the rule than agency counsel. No matter who chronicles the rule's near-ancient history for the reviewing court, it is difficult to characterize the agency's role in defending the regulation as the kind of administrative policymaking that prompted the Court's concerns in *Chenery.* Under these circumstances, re-

quiring an affidavit from the present Secretary would add little to counsel's representations. Relying on the latter does not appear to offend the core consideration that supports *Chenery*—that the *agency* rather than the *judiciary* supply the reasons for issuing a rule so as not to interfere with the agency's future deliberations—nor does it carry a particular risk that the real reasons for agency action will escape judicial scrutiny altogether. *Compare Church of Scientology of Calif. v. IRS*, 792 F.2d 153, 162–63 n. 4 (D.C.Cir. 1986) (en banc), *aff'd*, 484 U.S. 9, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987), *with id.* at 165–66 (Silberman, J., concurring). And it should be noted that if the district court were obliged in this case to demand an affidavit from the incumbent Secretary, the same obligation would attach whenever a federal court is presented with a challenge to a regulation properly issued without explanation, no matter how old—including regulations issued prior to passage of the APA.

In any event, there are special indicia of reliability that accompany counsel's statements in the case before us. The Secretary's position—though first announced in litigation—has been consistent; it was advanced before in the Tenth Circuit eight years ago. *See Martin v. Bergland*, 639 F.2d 647, 650–51 (1981).[4] Perhaps even more telling, the rule under review, and the regulations of which it forms a part, bear a strong resemblance to draft regulations published by Representatives Conte and Findley in the course of offering an amendment to the 1970 Act. *Compare* 116 Cong. Rec. 27,141, 27,141–42 (1970) (Conte–Findley draft regulations) with 35 Fed.Reg. 19,-339, 19,339–41 (1970) (Secretary's original regulations). Congressional concerns expressed during debate on the Conte–Findley amendment (including the draft regulations)—which focused on the need to prevent evasion of the payment limitation—can, we think, be imputed to the Secretary. Those concerns further suggest that the challenged regulation comports with *Con-*gress' vision as well as the administrator's. *Cf. Schweiker v. Gray Panthers*, 453 U.S. 34, 50 n. 22, 101 S.Ct. 2633, 2643 n. 22, 69 L.Ed.2d 460 (1981) (where "Congress itself [has] considered the 'relevant factors,'" *Overton Park* does not require parallel consideration by administrator). The husband-wife rule, we note, survived 17 years without congressional criticism, even though Congress revisited the authorizing statute four times during that period. *See* Pub.L. 99–198, § 1001(5)(A), 99 Stat. 1445 (1985); Pub.L. 97–98, § 1101(5), 95 Stat. 1263 (1981); Pub.L. 95–113, § 101(4), 91 Stat. 918 (1977); Pub.L. 93–86, § 101(4), 87 Stat. 221–22 (1973). And since Congress has now (in 1987) codified the Secretary's regulation with only a modest modification for future years, it would appear excessively formalistic to remand for an explanation of the 1970 rule—an explanation that would surely track recent as well as the original congressional concerns—in order to judge the rule's legality as applied to the 1988 crop year.

### B.

Once it is recognized, as appellees concede, that the word "person" as used in the statute was never intended to have its ordinary meaning, it seems rather obvious that the word is not self-defining. We are therefore puzzled by the district court's recourse to the "plain meaning" of the word person to support its rejection of the husband-wife rule. *WIFE*, 682 F.Supp. at 605. Congress explicitly authorized the Secretary to define the term "person." *See* Agricultural Act of 1970, § 101(4), 84 Stat. at 1359; 7 U.S.C. § 1308(5) (Supp. V 1987). That provision necessarily suggests that Congress did *not* intend the word to be applied in its plain meaning sense. In this sort of case, there is no need to rely on the presumptive delegation to agencies of authority to define ambiguous or imprecise terms we apply under the *Chevron* doctrine, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837,

---

**4.** While *Martin* involved only a constitutional challenge to the husband-wife rule, the rationale advanced by the Secretary in support of the rule was identical to that offered here. *See Martin*, 639 F.2d at 651.

844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984), for the delegation of interpretative authority is express. *See, e.g., United States v. Morton*, 467 U.S. 822, 834, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680 (1984).

WIFE does not quarrel with the core premise of the Secretary's regulation—that two or more individuals engaged in a common economic enterprise are not *per se* entitled to separate person status for purposes of the payment limitation—nor does WIFE challenge the regulation's requirement that individuals, in order to qualify for separate "personhood", must demonstrate separate economic and legal interests in an enterprise, as well as the exercise of separate responsibility and the making of separate contributions to the cost of operating the enterprise from separate accounts. *See* 7 C.F.R. § 795.3(b)(1) (1988). What appellee disputes, instead, is the rationality of presuming irrebuttably that husbands and wives collaborating in one or more farm enterprises (together with their minor children) cannot make the showing of "separateness" the Secretary requires. The Secretary makes no such presumption with respect to other economic associations of individuals, such as joint ventures, partnerships, and households composed of unmarried family members, *see id.* §§ 795.7 & 795.8 and appellee asserts that the crop subsidy statute may not be construed to permit nuclear families to be singled out for such unfavorable treatment. Accepting appellee's vision of fairness rather than the Secretary's, the district court concluded that "the policy of completely barring married couples from qualifying for two payments operates against … insuring that [the crop subsidy program] is implemented fairly." *WIFE*, 682 F.Supp. at 606.

A husband and wife, of course, form an interdependent unit in society quite apart from those circumstances where they are engaged in joint production on a family farm, or in other economic joint ventures, and this is not typically true of a corporation or partnership. The closeness of the family relationship makes it particularly difficult for the Secretary to analyze it as he would a solely economic enterprise in order to determine the existence of separate economic contributions. Even were the Secretary able to identify (without incurring a vexing and awkward administrative burden) the separate economic contributions each spouse makes to the operation of the family farm, typically the husband and wife and minor children form a common consumption unit. As our sister circuit said in rejecting a constitutional challenge to the same regulation, no matter how separately a husband and wife administer putatively independent farms, it cannot be denied that "each spouse benefits from the prosperity of the other." *Martin*, 639 F.2d at 651.

On that basis the Secretary, reasonably in our view, concluded that Congress, concerned about the public outcry against what were perceived as excessive crop subsidy payments, authorized him to treat husbands and wives as the same person. Since the husband and wife working together on a family farm typically enjoy certain unique efficiencies, perhaps on the production side but certainly on the consumption side, it would rationally be seen as unfair routinely to provide separate payments to both. (Even though the precise figure was hotly debated below, the cost of repealing the husband-wife rule (in terms of additional entitlements) was also at least relevant to the Secretary's decision to treat the husband and wife as one.)

Even if these efficiencies, in fact, are present in the ordinary marital household, appellee contends that it is arbitrary and unreasonable not to permit spouses to demonstrate the sort of economic separateness —which may occasionally exist—that would justify double payments. As the Secretary concedes, there may well be the occasional family farm where husbands and wives independently produce and independently consume the fruits of their respective labors. We are told, however, that it is exceedingly difficult, if not impossible, to draw an exception for the unusual husband and wife that maintain economic independence without enabling every farm couple to qualify. Under the eligibility criteria in 7 C.F.R. § 795.3 that apply to partnerships, for example, the Secretary as-

serts that the typical farm spouse could easily establish a separate contribution of labor (if nothing else) to the farm enterprise; beyond that, all that would be required for the typical couple to establish "separateness" under the existing regulations would be some documentary proof of separate spousal legal interests in the farm and separate bookkeeping for the husband and wife—proof that would be rather easy to muster in the ordinary case. While the Secretary admits that it might be possible to draft more discriminating standards to cabin such an exception, he argues that the administrative burden attending application of such standards would inevitably be heavy. We think this administrative concern was something the Secretary could account for in choosing marital status as a proxy for economic interdependence. *See Drummond Coal Co. v. Hodel,* 796 F.2d 503, 507 (D.C.Cir.1986), *cert. denied,* 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987); *cf. Parsons v. County of Del Norte,* 728 F.2d 1234, 1238 (9th Cir.1984) (sustaining against equal protection challenge anti-nepotism statute extending only to immediate family members and not to unmarried cohabitants), *cert. denied,* 469 U.S. 846, 105 S.Ct. 158, 83 L.Ed.2d 95 (1984).[5]

Essentially the Secretary had three options: the first was to allow husbands and wives operating a family farm to qualify easily for separate (double) crop subsidy payments; the second—the one chosen—to make it impossible; and the third, to try to distinguish between farm families through the application of extensive administrative regulations. Once it is recognized that the Secretary had no obligation under the statute to choose the third option because it necessarily implied a significant commitment of governmental resources, it follows that the Secretary was free to choose either the first or second. Put another way, there was no encompassing, administratively practicable middle ground.[6]

■ Appellee argues, and the district court agreed, that the policy of the statute obliged the Secretary to choose the first option over the second since the former would encourage the operators of sizable family farms to divert greater acreage from production. As the court below put it, "the husband-wife rule operates to allow supply in excess [of] that intended by Congress." *WIFE,* 682 F.Supp. at 604. This analysis impermissibly ignores the purpose of the payment limitation which *itself* operates to restrict the amount of acreage diverted from production; we cannot examine the husband-wife rule exclusively through the lens of "maximum participation" without according some significance to Congress' willingness to impose a payment limitation on the program. The district court's approach—focusing only on the overall purpose of the statute and disregarding the purpose of the payment limitation—was quite artificial. "[P]ermitting

---

**5.** Unlike appellee, we do not believe that the Secretary's determination to permit minor children, in narrow circumstances, to demonstrate an entitlement to separate payments, *see supra* n. 2, obliges him to allow husbands and wives to make a similar showing. The "minor child" exceptions appear to us to be addressed largely to rare circumstances in which a minor is substantially emancipated from the parents' household, economically if not legally, *see* 7 C.F.R. § 795.12(a) (1988), and the factual showing required of the minor in each instance is not something that is capable of ready fabrication. To permit married couples to qualify similarly —for instance, if they could demonstrate that their marriages do not involve the sorts of efficiencies that characterize the typical marriage— would invite problems of administration different in both kind and magnitude from those attending the "minor child" exceptions. Not only would—as the Secretary reasonably believed—a substantial percentage of farm couples petition to receive separate payments, but also the essential condition alleged in each such petition would be exceedingly difficult to verify.

**6.** It might be said that Congress settled on a middle ground in 1987, but the territory affected was tightly circumscribed. Congress required the Secretary to assume the administrative burden of verifying the existence of separate operations *only* for those farm households where the husbands and wives owned separate and unrelated farms prior to the marriage.

As we understand WIFE's argument (at least the constitutional claim), it would perforce apply to the statute as amended in 1987. Thus, the district court *en passant* suggested that the 1987 amendment, by codifying the husband-wife rule, was itself unconstitutional. *WIFE,* 682 F.Supp. at 608 n. 17.

nullification of [administrative] classifications based rationally on nonprimary legislative purpose[s] would allow courts to peruse legislative proceedings for subtle emphases supporting subjective impressions and preferences." *McGinnis v. Royster*, 410 U.S. 263, 277, 93 S.Ct. 1055, 1063, 35 L.Ed.2d 282 (1973) (applying constitutional test of rationality). We cannot help but conclude that the district court's reasoning was driven by just such preferences. *See Rodriguez v. United States*, 480 U.S. 522, 526, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (per curiam) ("it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law").

As we, have noted, the husband-wife rule was at least partially inspired by draft regulations proposed by Representatives Conte and Findley in connection with a floor amendment they offered unsuccessfully during the House debate on the 1970 Act. That amendment, *inter alia*, would have authorized the Secretary to issue regulations preventing "circumvention or evasion" of the payment limitation, *see* 116 Cong. Rec. 27,141 (1970), and the draft regulations included the husband-wife rule as an example of a prophylactic protection against evasion. *See id.* at 27,142. The amendment was defeated, and from that event appellee concludes that Congress disavowed any generalized purpose of preventing evasion of the payment limitation and, indeed, had a specific intent to reject the subordinate husband-wife rule. We think appellee's interpretation of the amendment's legislative history is more imaginative than real. The defeated Conte–Findley amendment, in addition to incorporating into the statute explicit anti-evasion language, would have reduced the payment limitation (then being debated) from $55,000 to $20,000. *Id.* at 27,141. It therefore was reasonable for the Secretary to conclude that the draconian cut in payments, rather than the evasion language, led to Congress' defeat of the Conte–Findley amendment. After all, the statute, as passed, not only authorized the Secretary to define the term "person," it charged him

with "prescribing such rules as he determine[d] necessary to assure a fair and reasonable application of [the] limitation." *See* Agricultural Act of 1970, § 101(4), 84 Stat. at 1359. That delegation of responsibility would seem necessarily to include a direction to prevent evasion, since it is inconceivable that Congress would think "evasion" of a limitation was "fair and reasonable." The very word "evasion" suggests the opposite.

Although we would uphold the Secretary's definition of the term "person" as a lawful interpretation of the statute even if the statute had only recently been enacted, we think the fact that the husband-wife rule has lasted for 17 years and has survived several congressional reauthorizations of the crop-subsidy program adds support to our decision. *See supra* p. 1000. It is not as if Congress was generally unaware of the regulation at issue during this period. In 1973, Congress required the Secretary to continue treating corporations and their stockholders in the manner specified in his original regulation. *See* Pub.L. No. 93–86, § 101(4), 87 Stat. 221, 222 (1973); *see also* Pub.L. No. 99–500, § 108(c)(1)(A), 100 Stat. 1783, 1783–347 (1986) (directing Secretary to "determine ways in which [the payment limitation] regulations can be revised to better ensure the fair and reasonable application of limitations and eliminate fraud and abuse in the application of such payment limitations"). True, Congress did not legislatively ratify the husband-wife rule until 1987, *see, e.g., AFL–CIO v. Brock*, 835 F.2d 912, 915–16 (D.C.Cir.1987) (describing legislative reenactment doctrine), but we think Congress' explicit recognition of the Secretary's regulations is entitled to some weight in determining whether that regulation is at least a reasonable interpretation of the statute. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846, 106 S.Ct. 3245, 3255, 92 L.Ed.2d 675 (1986) (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974)).

### III.

Since we have concluded that the challenged regulation is authorized by the

statute, we test WIFE's constitutional claim as if the regulation was itself part of the statute. We ask ourselves whether the statute, if it included the husband-wife rule, would withstand constitutional examination.

The Due Process Clause of the Fifth Amendment and its equal protection component protect individuals generally from arbitrary burdens on life, liberty, and property interests on the one hand, and arbitrary statutory classifications on the other. *See, e.g., Ross v. Moffitt*, 417 U.S. 600, 609, 94 S.Ct. 2437, 2443, 41 L.Ed.2d 341 (1974). Enforcement of these constitutional guarantees, though, does not require the judiciary "to sit as a superlegislature" in judgment of the wisdom of Congress' "legislative policy determinations." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). In the realm of social and economic regulation, in particular, the role of the courts is narrow: only if Congress' choice in imposing burdens or erecting classifications represents " 'a display of arbitrary power, not an exercise of judgment,' " *Mathews v. DeCastro*, 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976) (quoting *Helvering v. Davis*, 301 U.S. 619, 640, 57 S.Ct. 904, 908, 81 L.Ed. 1307 (1937)), is judicial intervention warranted. *See also Railway Express Agency v. New York*, 336 U.S. 106, 112, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949) (Jackson, J., concurring) (classification may be sustained only if it rests "upon some reasonable differentiation fairly related to the object of the regulation"). Insistence on a tight fit between legislative means and ends is called for only when Congress acts along suspect (or semi-suspect) lines or in contravention of fundamental liberties, *see e.g., Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981); *City of New Orleans*, 427 U.S. at 303, 96 S.Ct. at 2516, *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724–26, 102 S.Ct. 3331, 3336–37, 73 L.Ed.2d 1090 (1982), for it is otherwise presumed that "democratic processes" are available to remedy "even improvident [legislative] decisions." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

We think the district court was quite correct in concluding that heightened scrutiny of the husband-wife rule is inappropriate because the rule does not "interfere directly and substantially with the right to marry," *Zablocki v. Redhail*, 434 U.S. 374, 387, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978). The rule neither "place[s] [a] direct legal obstacle in the path of persons desiring to get married," *id.* at 387 n. 12, 98 S.Ct. at 681 n. 12, nor significantly discourages marriage. *Id.* As such, our inquiry is limited to asking whether "the legislation classif[ies] the persons it affects in a manner rationally related to legitimate government objectives." *Wilson*, 450 U.S. at 230, 101 S.Ct. at 1081, *see also Kadrmas v. Dickinson Pub. Schools*, —— U.S. ——, 108 S.Ct. 2481, 2489–90, 101 L.Ed.2d 399 (1988); *Bowen v. Gilliard*, 483 U.S. 587, 107 S.Ct. 3008, 3017, 97 L.Ed.2d 485 (1987); *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Given our disposition of appellee's administrative law challenge, the constitutional analysis should not be particularly troublesome. The Tenth Circuit, presented with the same constitutional question, had little difficulty in finding the financial interdependence of husband and wife to constitute a rational basis for the regulation. *See Martin*, 639 F.2d at 650–51.

The district court, nevertheless, thought that the justifications offered to support the rule were pretextual. At its core, the rule was believed by the district court to harbor a stereotypical and belittling judgment about the role of women in marriage. *WIFE*, 682 F.Supp. at 605, 607. There are two difficulties with the court's reasoning. The first is that the court was quite obviously engaged in review which more nearly equates with heightened scrutiny than that which accompanies the more deferential determination as to whether or not a challenged statute passes the rational-basis test. When applying the latter test, the Supreme Court has often stated that a classification may be sustained if any *conceivable* justification would support it. *See Kadrmas*, 108 S.Ct. at 2489–90; *Gilliard*,

107 S.Ct. at 3017.[7] Ordinarily, there is no necessity in rational-basis scrutiny for a separate inquiry into the legislature's *actual* motivation, for the legislature's subjective motivation does not undermine a classification's validity provided legitimate motivations are conceivable. *See, e.g., Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 875 n. 5, 105 S.Ct. 1676, 1680 n. 5, 84 L.Ed.2d 751 (1985) (remanding for examination of additional conceivable justifications after proffered justifications were rejected as impermissible).[8] Second, we disagree that impermissible stereotyping is here lurking behind the facade of a sex-neutral explanation. Appellee has offered nothing to show that the regulation implies anything at all about the respective roles of men and women in a marriage. We have no grounds for concluding that the regulation does anything more (or less) than assume that, whatever their roles, married men and women constitute one economic unit—that "marriage is an event which normally marks an important change in economic status." *Califano v. Jobst,* 434 U.S. 47, 53, 98 S.Ct. 95, 99, 54 L.Ed.2d 228 (1977).

The treatment of wife and husband as a unit in modern settings is not, as appellee suggests, inevitably malign. Contemporary community property regimes (stripped, of course, of the ancient rule that made the man "head and master" of jointly-owned property,[9] *see Kirchberg v. Feenstra,* 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981)) have not commonly been thought invidious. A quite similar premise is embedded in the Internal Revenue Code, which provides separate tax schedules for married and unmarried persons, *see* I.R.C. § 1 (Supp. V 1987); *see generally Druker v. Comm'r,* 697 F.2d 46 (2d Cir.1982), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983),[10]

---

**7.** The "any conceivable basis" formulation of the rational-basis test appears more frequently than any other in Supreme Court opinions. We recognize, nevertheless, that the Court has on occasion looked only to *articulated* legislative purposes in applying rational-basis scrutiny to challenged classifications. *See, e.g., Cleburne Living Center,* 473 U.S. 432, 446, 450, 105 S.Ct. 3249, 3257, 3259, 87 L.Ed.2d 313 (1985); *Plyer v. Doe,* 457 U.S. 202, 228–30, 102 S.Ct. 2382, 2400–2402, 72 L.Ed.2d 786 (1982). By characterizing the rational-basis test as we do in text, we do not mean to suggest that such a deferential formulation is determinative of the outcome in this case. As we have shown in Part II, Congress satisfactorily articulated the policy considerations the Secretary attempted to accommodate in promulgating the husband-wife rule; thus, were we to examine only Congress' articulated purposes, we would reach the same conclusion as to the constitutional question.

**8.** If it can be established that Congress' subjective motivation was purposefully to discriminate along lines that would warrant heightened scrutiny, such actual legislative motivation can be highly relevant. *See, e.g., Guinn v. United States,* 238 U.S. 347, 364–65, 35 S.Ct. 926, 931, 59 L.Ed. 1340 (1915) (race); *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1986) (same); *Geduldig v. Aiello,* 417 U.S. 484, 496 n. 20, 94 S.Ct. 2485, 2492 n. 20, 41 L.Ed.2d 256 (1974) (gender).

**9.** Blackstone's explanation of the "ancient rule" seems shocking today:

By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband; under whose wing, protection, and *cover,* she performs everything; and is therefore called in our law-french a *feme-covert* ... under the protection and influence of her husband, her *baron,* or lord; and her condition during her marriage is called her *coverture.*

1 Blackstone's Commentaries on the Law of England 442 (3d ed. 1768).

**10.** As a general rule of thumb, marriage will increase a couple's tax burden as compared with that of two single persons whenever the lesser-earning spouse earns 20% or more of the couple's total income and decrease its tax burden whenever the lesser-earning spouse earns less than 20%.

*Druker,* 697 F.2d at 49 n. 2 (citing Gerzog, *The Marriage Penalty: The Working Couple's Dilemma,* 47 Fordham L.Rev. 27, 28 (1978)); *see also* Staff of Joint Committee on Taxation, 99th Cong., 1st Sess., General Explanation of the Tax Reform Act of 1986 (Comm. Print 1987) (analyzing current tax-rate schedules). By placing a financial premium on having the "lesser-earning spouse" (usually the wife, as a statistical matter) stay at home, it could be argued that the Internal Revenue Code harbors a sexist judgment about the "proper" role of women in marriage. *Cf. Druker,* 697 F.2d at 49 n. 2. Instead, however, the Code's treatment of married couples has customarily been perceived as ensuring horizontal equity between married couples, *see Druker,* 697 F.2d at 50; this principle, of course, is rooted in the notion that a marital household is a distinct economic unit.

and we see no basis to challenge this policy premise as demeaning of either women or men, or the institution of marriage.[11] *See also* 26 U.S.C. § 2056(a) (Supp. V 1987) (exempting from estate taxes bequests to surviving spouses).

That married persons constitute a distinct economic unit is an assumption quite similar, we think, to the legislative presumption challenged in *Lyng v. Castillo*, 477 U.S. 635, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986). The Supreme Court there held that Congress could rationally presume, when dispensing food stamps to needy persons on a household-by-household basis, that a husband and wife, a husband and wife with children, or siblings all living under one roof, constitute only one household— whether or not they could show they prepared their meals separately. *See* 7 U.S.C. § 2012(i) (1982 & Supp. V 1987). Congress "could reasonably determine that close relatives sharing a house—almost by definition—tend to purchase and prepare meals together while distant relatives and unrelated individuals might not be so inclined." *Id.* at 642, 106 S.Ct. at 2731. The court rejected the argument that the statute was unconstitutional merely because not every family conformed to the legislative model since the "cost-ineffectiveness of case-by-case verification of claims that individuals ate as separate households unquestionably warrant[ed] the use of general definitions[.]" *Id.* at 640–41, 106 S.Ct. at 2731. It seems clear, then, that Congress constitutionally may legislate with a family model in mind that reflects economic and social reality. *See also Califano v. Boles*, 443 U.S. 282, 289, 99 S.Ct. 2767, 2772, 61 L.Ed.2d 541 (1979) (upholding law providing "mother's insurance benefits" to widows and divorced wives of wage earners but not to mothers who never married the child's father on basis that "Congress could reasonably conclude that a woman who has never been married to the wage earner is far less likely to be dependent on wage earner at the time of his death").

The district court, relying on *Department of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), also thought that the Secretary's regulation failed constitutional rationality because wealthy and clever farm couples could escape its restrictions, whereas relatively poorer ones could not. Thus, as is undisputed, if a husband and wife formed a corporation to operate their farm—and met the corporation eligibility standards—they could qualify for two maximum payments, one for the corporation itself and one more for the two of them as stockholders. Of course, the husband-wife rule would still distinguish a "marriage" corporation from one formed by two unmarried stockholders because the latter could entitle its creators to three separate payments. It is argued, nevertheless, that the corporate device is a unique advantage available to the privileged and not to "those persons who are so desperately in need of aid that they cannot even afford to alter their living arrangements [so] as to retain their eligibility." *WIFE*, 682 F.Supp. at 606 (quoting *Moreno*, 413 U.S. at 538, 93 S.Ct. at 2827).

It seems rather peculiar to us to describe a family farm operated by a husband and

---

**11.** Conceding that economic interdependence might be relevant under some statutory schemes, the district court suggested that "it is plainly irrelevant under the crop subsidy program." *See WIFE*, 682 F.Supp. at 605. The district court's view was apparently based on the notion that Congress did not expressly articulate an interdependence test in enacting the crop subsidy payment limitation. *See id.* at 604. This confuses constitutional analysis of the rule with inquiry into the rule's validity under the farm support statute. Once one concludes that a challenged regulation is founded on a rational accommodation of Congress' objectives in enacting the underlying statute, the constitutionality of the regulation is tested as if Congress struck

the balance embodied in the regulation. Thus, it is irrelevant to the constitutional question that Congress did not *expressly* articulate an economic interdependence qualification in the farm support statute. It is doubly irrelevant, of course, if our constitutional inquiry is limited to asking whether any *conceivable* government objective might rationally support the husband-wife rule. *See Kadrmas*, —— U.S. ——, 108 S.Ct. at 2489–90, 101 L.Ed.2d 399 (1988); *Bowen*, 107 S.Ct. at 3017; *McGowan*, 366 U.S. at 426, 81 S.Ct. at 1105. In any event, the district court's narrow conception of Congress' legitimate objectives prompted the court to overstep the boundaries of rational-basis scrutiny.

wife, one that is so large as to qualify for the maximum crop payment of $50,000, as "desperately in need of aid." Indeed, we cannot imagine why any couple bumping up against that ceiling would be significantly less financially capable to form a corporation than any other—depending, of course, on varying state corporation laws. In any event, we do not read *Moreno* (particularly as interpreted and limited by *Lyng v. Castillo*) constitutionally to oblige Congress or the Secretary to ensure that all farm couples who are entitled to the maximum crop payment have the same advantages that those, arguably smarter or wealthier than the rest, enjoy through use of the corporate form. To so hold, it seems to us, would come perilously close to the discredited view of substantive due process employed in the early part of this century—albeit in favor of redistributive policies rather than against them. *Moreno*—subsequently described by Congress as striking down an anti-"hippie-commune" limitation on the distribution of food stamps, *see Castillo*, 477 U.S. at 639 n. 3, 106 S.Ct. at 2730 n. 3 (quoting H.Rep. No. 464, 95th Cong., 1st Sess. 140 (1977))—merely held that Congress' anti-fraud purpose was not served by refusing food stamps to those who shared their households with nonrelatives. Its holding was not directed to any disparate treatment between the wealthy and poor, let alone between the wealthy and the merely well-off.

Congress—through the Secretary—has reasonably determined that married couples, as a group, are more likely than other "partners" in farming enterprises to share completely in the products of their efforts—in other words, to be economically interdependent—and the Constitution requires no more precision than this in the circumstances we confront. *See Bowen v. Owens*, 476 U.S. 340, 348–50, 106 S.Ct. 1881, 1886–87, 90 L.Ed.2d 316 (1986); *Boles*, 443 U.S. at 289, 99 S.Ct. at 2772; *Jobst*, 434 U.S. at 53, 98 S.Ct. at 99; *Mathews*, 429 U.S. at 188–89, 97 S.Ct. at 435–36; *Weinberger v. Salfi*, 422 U.S. 749, 780–85, 95 S.Ct. 2457, 2474–77, 45 L.Ed.2d 522 (1975). For "[g]eneral rules are essential if a [program] of this magnitude is to be administered with a modicum of efficiency, even though such rules inevitably produce seemingly arbitrary consequences in some individual cases." *Jobst*, 434 U.S. at 53, 98 S.Ct. at 99; *see also Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). The judgment is accordingly reversed and the cause remanded to the district court for vacatur of the injunction entered against enforcement of the husband-wife rule and for further proceedings not inconsistent with this opinion.

*It is so ordered.*