BEACH COMMUNICATIONS, INC., Maxtel Limited Partnership, Pacific Cablevision and Western Cable Communications, Inc., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Spectradyne, Inc., National Cable Television Association, Inc., Wireless Cable Association, Inc., Southwestern Bell Corporation and Hughes Communications Galaxy, Inc., Intervenors.

No. 91–1089.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1991.

Decided March 6, 1992.

Deborah C. Costlow, Washington, D.C., for petitioners.

Roberta L. Cook, Atty. F.C.C., with whom Robert L. Pettit, Gen. Counsel, John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., James F. Rill, Asst. Atty. Gen., and Robert B. Nicholson and James W. Lowe, Attys., U.S. Dept. of Justice, Washington, D.C., were on the brief, for respondents. Daniel M. Armstrong, Associate Gen. Counsel, Washington, D.C., also entered an appearance for respondents.

Brenda L. Fox and Diane B. Burstein, Washington, D.C., were on the brief for intervenor Nat. Cable Television Ass'n, Inc. Seth A. Davidson, Washington, D.C., also entered an appearance for intervenor.

Ronald A. Siegel and Mark L. Pelesh, Washington, D.C., entered appearances for intervenor Spectradyne, Inc.

Paul J. Sinderbrand and Robert F. Aldrich, Washington, D.C., entered appearances for intervenor Wireless Cable Ass'n, Inc.

Martin E. Grambow, Washington, D.C., James D. Ellis and Liam S. Coonan, St. Louis, Mo., entered appearances for intervenor Southwestern Bell Corp.

Gary M. Epstein, Washington, D.C., entered an appearance for intervenor Hughes Communications Galaxy, Inc.

Before: MIKVA, Chief Judge, EDWARDS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Separate concurring statement filed by Chief Judge MIKVA.

HARRY T. EDWARDS, Circuit Judge:

This case involves a challenge to a Federal Communications Commission ("FCC" or "Commission") construction of the Cable Communications Policy Act of 1984 ("Cable Act"). According to the FCC, the Cable Act covers Satellite Master Antenna Television ("SMATV") facilities with wires interconnecting separately owned, controlled and managed multiple-unit dwellings, even when the wires do not use public rights-of-way. SMATV companies petition for review, arguing that the Commission has misinterpreted the statute, and that local franchising (as may be required pursuant to the Cable Act) violates their First Amendment and equal protection rights.

We reject petitioners' statutory challenge, for the plain language of the Cable Act defines the disputed SMATV facilities as "cable systems," and that definition is consistent with the legislative history as well as the preexisting regulatory regime.

As for petitioners' First Amendment claim, we find it unfit for judicial decision under *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and therefore unripe. The Cable

Act requires every cable operator to have a local franchise, but gives each locality the discretion to create its own franchising regime. We cannot find the statute unconstitutional on its face, because we do not know whether conditions in any given locality will justify a burden on petitioners' speech, nor do we know what kind of burden will need to be justified, nor the appropriate First Amendment standard. Thus, we cannot assess any claim of First Amendment infringement absent an as-applied challenge to some specific franchising requirement. Since petitioners present no such claims in this appeal, we dismiss this portion of the case as unripe.

We cannot dispose of petitioners' equal protection challenge so easily, for it raises a "purely legal" issue that is ripe for judicial review and, also, poses a serious constitutional problem. Normally, in considering the constitutionality of a statute, we seek a reasonable reading that avoids constitutional infirmities. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). Here, however, we face seemingly insurmountable difficulties in achieving this goal. Under the FCC's construction of the Cable Act, a video transmission facility is not a "cable system" if the facility's wires are internal to multiple-unit dwellings, or if the interconnected buildings are commonly owned, controlled or managed and the wires do not use public rights-of-way. We see no "rational basis" for the distinction between these two types of exempted facilities and SMATV facilities that interconnect separately owned, controlled and managed buildings without using rights-of-way. Absent some rational basis for this statutory distinction, petitioners' equal protection challenge may have merit. Because the record is lacking on this point, we remand for supplementation by the FCC.

## I. Background

The traditional cable television system receives signals at a remote location and transmits them throughout a community via a network of wires that use local rights-of-way. The Cable Act provides the framework for local franchising of this sort of system. SMATV is smaller than traditional cable systems, for it usually involves a single building or building complex that is wired to a satellite antenna. The question here is whether the Cable Act covers a SMATV facility located wholly on private property and, if so, whether the Constitution permits such coverage. The regulatory history of cable franchising helps clarify this question, and we briefly review it.

Prior to the Cable Act, the FCC regulated cable television without a specific governing statute. The Commission had evolved a dual regime for "cable systems," which were defined as:

> non-broadcast facilit[ies] consisting of a set of transmission paths and associated signal generation, reception, and control equipment ... but such term shall not include ... any such facility that serves or will serve only subscribers in one or more multiple unit dwellings under common ownership, control, or management.

47 C.F.R. § 76.5(a) (1984). State and local governments were given the task of franchising cable systems, while the FCC had exclusive jurisdiction over signal carriage, technical standards and other operational matters. *See generally New York State Comm'n on Cable Television v. FCC*, 749 F.2d 804, 807–11 (D.C.Cir.1984) (general history of dual regime). This was so because "conventional licensing would [have] place[d] an unmanageable burden on the Commission. Moreover, local governments are inescapably involved in the process because cable makes use of streets and ways...." *Cable Television Report & Order*, 36 F.C.C.2d 143, 207 (1972).

The FCC's original definition of cable systems included the so-called "private cable" exemption, for facilities that served "only subscribers in one or more multiple unit dwellings under common ownership, control, or management." This provision was originally designed for Master Antenna Television ("MATV") systems, which receive and redistribute normal broadcast signals. On its face, 47 C.F.R. § 76.5(a) exempted two kinds of MATV systems.

The first was a system where the wires were confined to a single multiple-unit dwelling: for example, a MATV antenna on the roof of an apartment house, wired only to apartments in that building. The second was a system where the wires connected a group of buildings that were commonly owned, controlled or managed: for example, a MATV facility for a single apartment complex. Conversely, the language did *not* cover a system interconnecting apartment buildings that were separately owned, controlled or managed. And, indeed, the FCC interpreted its definition of a "cable system" to exempt the first two kinds of MATV facilities, and to include the third. *See generally In re Amendment of Part 76*, 54 F.C.C.2d 824, 826–27 (1975) (notice of rulemaking); *In re Amendment of Part 76*, 63 F.C.C.2d 956, 990–97 (1977).

During this pre-Cable Act period, new alternatives to traditional cable television began to emerge. One such alternative was SMATV; another was multipoint distribution ("MDS") via microwaves. In 1978, the FCC preempted local franchising of a MDS system that beamed microwaves from the Empire State Building to rooftop antennae. *See In re Orth–O–Vision*, 69 F.C.C.2d 657 (1978), *reconsideration denied*, 82 F.C.C.2d 178 (1980), *review denied sub nom. New York State Comm'n on Cable Television v. FCC*, 669 F.2d 58 (2d Cir.1982). Several years later, in *In re Cable Dallas, Inc.*, 93 F.C.C.2d 20 (1983), the FCC decided that a SMATV system serving a "cluster[ ] of apartment buildings, ... composed of buildings not under common ownership, management, or control," *id.* at 21, was a "cable system." However, the Commission ruled that the franchising of a single-building SMATV

system was preempted. *See In re Earth Satellite Communications, Inc.*, 95 F.C.C.2d 1223 (1983), *aff'd sub nom. New York State Comm'n on Cable Television v. FCC*, 749 F.2d 804 (D.C.Cir.1984). In the latter ruling, the FCC stated that "SMATV systems which are defined as cable television systems by this Commission are not under scrutiny here," 95 F.C.C.2d at 1224 n. 3, and this circuit noted the proviso in affirming the Commission, *see New York State Comm'n*, 749 F.2d at 807 n. 1.

Although the FCC did not say so explicitly, the pattern of decisions in *Orth–O–Vision, Cable Dallas* and *Earth Satellite Communications* was consistent with the pattern for MATV. A MDS or SMATV facility for multiple-unit dwellings was a "cable system" if and only if the wires were "external" (*i.e.*, served to connect separate buildings) and the interconnected buildings were not commonly owned, controlled or managed.

Congress promulgated the Cable Act to establish, *inter alia,* "a national policy concerning cable communications," "guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems," and "franchise procedures and standards which encourage the growth and development of cable systems and which assure that cable systems are responsive to the needs and interests of the local community." 47 U.S.C. § 521 (1988). Section 621(b)(1) of the Act requires every cable operator to have a local franchise,[1] and section 602(6) defines a "cable system" as follows:

> a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equip-

---

1. "Except to the extent provided [by a grandfather clause], a cable operator may not provide cable service without a franchise." 47 U.S.C. § 541(b)(1) (1988). A franchise is defined as "an initial authorization, or renewal thereof ..., issued by a franchising authority, whether such authorization is designated as a franchise, permit, license, resolution, contract, certificate, agreement, or otherwise, which authorizes the construction or operation of a cable system." 47 U.S.C. § 522(8) (1988). A "franchising authority" is "any governmental entity empowered by Federal, State, or local law to grant a fran-

chise." *Id.* § 522(9). We use the term "local franchise" to mean "franchise from a franchising authority." *See* H.Rep. No. 934, 98th Cong., 2d Sess. 45 (1984), U.S.Code Cong. & Admin.News 1984, pp. 4655, 4682 ("In several states ... the franchising process includes approval of a franchise by a state agency as well as by a local government. [Congress] intends that in such cases the term 'franchising authority' shall include these state agencies, in addition to any local government body with authority to grant a franchise, including a military authority if authorized to grant such a franchise.").

ment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community, but such term does not include ... (B) a facility that serves only subscribers in 1 or more multiple unit dwellings under common ownership, control, or management, unless such facility or facilities uses any public right-of-way.

47 U.S.C. § 522(6) (1988); *see also* 47 C.F.R. § 76.5(a) (1990) (same definition). This definition incorporated *verbatim* the Commission's prior "private cable" provision, with one important change: the final proviso that a facility is exempted "unless such facility or facilities uses any public right-of-way." [2]

The right-of-way proviso, on its face, makes the use of public rights-of-way a *sufficient* condition for a "cable system," not a *necessary* condition. However, the FCC initially interpreted § 602(6) to mean that "[w]hen multiple unit dwellings are involved, the distinction between a cable system and other forms of video distribution systems is now the crossing of the public rights-of-way, not the ownership, control or management." *In re Amendment of Parts 1, 63 & 76,* 104 F.C.C.2d 386, 396–97 (1986), *modifying on other grounds Implementation of the Provisions of the Cable Communications Policy Act of 1984,* 50 Fed.Reg. 18,637 (1985). Soon thereafter, the FCC reconsidered the meaning of § 602(6). *See Definition of a Cable Television Sys.,* 54 Fed.Reg. 14,253 (1989) (notice of rulemaking). After hearing comments from interested parties, the FCC issued a new interpretation. *See In re Definition of a Cable Television Sys.,* 5 F.C.C.Rcd. 7638 (1990). [3]

The rulemaking covered video transmission facilities for multiple-unit dwell-

ings. [4] A "cable system" is defined by § 602(6) as using a "closed transmission path[ ]," and the FCC decided that this term included only wire and other *physical* connections, not the microwave transmission used by MDS. *See id.* at 7638–39. Moreover, a facility would "use[ ] any public right-of-way" for purposes of the proviso in § 602(6)(B) only if a wire or some other "closed transmission path" impinged upon the right-of-way. *See id.* at 7641–42. The FCC then considered whether a video facility would constitute a "cable system," even if its "closed transmission paths" did not transect rights-of-way. Here, the Commission relied upon the plain language of § 602(6)(B) as well as its regulatory history.

[The FCC's decisions prior to the Cable Act] made clear that the use of wire or cable within the confines of a multi-unit building is not sufficient to bring the service within the jurisdictional bounds of a 'cable' system.... [Where] buildings were connected by radio alone, the Commission did not treat the facilities as cable systems, even where the buildings were not commonly-owned and thus were not within the exemption for multiple-unit dwellings.

*Id.* at 7640. Conversely,

[w]here ... buildings are interconnected by closed transmission paths, Commission precedent and the plain language of the statutory exemption make clear that the services must be considered cable systems unless (1) the buildings are commonly owned, controlled, or managed and (2) the facilities do not use any public rights-of-way.

*Id.* at 7641 (citation omitted).

Thus, the FCC adopted the following "general principles ... [that] should pro-

---

**2.** The Cable Act also omitted the phrase "will serve" from the regulatory exemption, which had covered a "facility that serves or *will serve* only subscribers in 1 or more multiple unit dwellings under common ownership, control, or management" (emphasis added).

**3.** *See also Definition of a Cable Television Sys.,* 56 Fed.Reg. 1931 (1991) (summary of rulemaking).

**4.** The FCC already had considered whether the Cable Act covers a facility for single-unit dwellings, e.g., a SMATV system for a mobile home park or a complex of vacation homes. *See In re Mass. Community Antenna Television Comm'n CSR–2997,* 2 F.C.C.Rcd. 7321 (1987).

vide ample guidance in interpret[ing]" § 602(6).

> [F]acilities must be interconnected by physically closed or shielded transmission paths to meet the statute's threshold requirement for a cable system. Use of radio or infrared transmissions alone does not meet this threshold criterion. The use of wire or cable exclusively within the premises of multiple unit buildings ... also does not fall within the statutory definition.... However, where a wire or cable is used to interconnect MATV or SMATV equipped buildings, the system is a cable facility unless the several buildings are commonly owned, controlled, or managed and the system's physically closed interconnection paths do not use a public right of way.

*Id.* at 7642–43. We will refer to this set of principles as the "Cable Definition Rule." [5]

 The instant case is a petition for review of the Cable Definition Rule. The petitioners are SMATV companies, and their facial challenge is focused on one aspect of the rule: that a SMATV facility with wires or other closed transmission paths interconnecting separately-owned, controlled and managed multiple-unit dwellings, without those wires using public rights-of-way, is a "cable system." We will call this kind of SMATV facility an *"external, quasi-private"* facility.[6] Conversely, we use the term *"internal"* to mean a facility where wires do not interconnect separate buildings or use public rights-of-way, and *"wholly private"* to mean a facility that serves a single building or a group of commonly-owned, controlled or managed buildings and the facility's wires do not use

public rights-of-way.[7] The *internal* and *wholly private* systems are the two kinds of facilities that are *not* cable systems under the Cable Definition Rule. Petitioners argue that the Commission has incorrectly interpreted § 602(6) to cover *external, quasi-private* SMATV, and that the Cable Definition Rule violates their First Amendment and equal protection rights by requiring them to obtain local franchises.[8]

## II. ANALYSIS

### A. *The Statutory Challenge*

We reject petitioners' statutory challenge to the Cable Definition Rule. Section 602(6) of the Cable Act *does* cover an *external, quasi-private* SMATV system. This finding concludes our inquiry on the statutory challenge, because, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). It is true that the Cable Definition Rule raises a special case, because the rule poses a serious equal protection problem. *See* section II.B.2. *infra.* And, normally, a court is obliged to construe a statute to avoid constitutional problems. *See DeBartolo*, 485 U.S. at 575, 108 S.Ct. at 1397. The difficulty here is that there is no reasonable alternative construction for the disputed language in the statute; and we have no authority to ascribe a construction to a statute that is "plainly contrary to the intent of Congress." *Id.* As the FCC found, the plain language of § 602(6) defines an *exter-*

---

5. The word "rule" is not meant to imply that *In re Definition of a Cable Television System* creates a substantive rule. For purposes of this petition, we need not decide whether the FCC's "general principles" are interpretative or substantive.

6. Petitioners have standing because they currently operate *external, quasi-private* SMATV facilities or have concrete plans to operate such facilities.

7. The two categories are not mutually exclusive.

8. The FCC did not address these constitutional issues in proposing or promulgating the Cable Definition Rule. Petitioners need not have raised the issues below. *See Northwestern Ind. Tel. Co. v. FCC*, 872 F.2d 465, 470 n. 3 (D.C.Cir. 1989) (no exhaustion requirement for facial constitutional challenge to FCC action), *cert. denied*, 493 U.S. 1035, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990).

Petitioners do not challenge any feature of the Cable Act or FCC regulations except local franchising. Specifically, they do not challenge any direct federal requirement for cable systems.

nal, *quasi-private* SMATV facility as a "cable system," and the legislative history does not contradict this plain meaning.

Section 602(6) has a definitional clause and then the private-cable exemption, § 602(6)(B). The definitional clause reads as follows: "the term 'cable system' means a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community." 47 U.S.C. § 522(6) (1988). It is clear that this definitional clause covers *external, quasi-private* SMATV. Petitioners do not dispute that an *external, quasi-private* SMATV facility has "closed transmission paths," as well as the "associated ... equipment," and is "designed to provide cable service which includes video programming." Rather, they argue that such a facility does not provide cable service "to multiple subscribers within a community," because *external, quasi-private* SMATV serves only the residents of a particular group of buildings, not the entire locality. But the definitional clause is not reasonably interpreted to require that a "cable system" must interconnect a whole "community." The words "within a community" do not support this interpretation, whatever else they mean. Otherwise, a cable operator could evade the Cable Act by neglecting to wire some small fraction of local dwellings. Moreover, petitioners' reading of the definitional clause makes surplusage of the private-cable exemption. A "facility that serves only subscribers in 1 or more multiple unit dwellings under common ownership, control, or management," 47 U.S.C. § 522(6)(B) (1988), will rarely, if ever, comprise the entire "community."

Thus, an exemption for *external, quasi-private* SMATV cannot fairly be ascribed to the definitional clause of § 602(6). Nor can it be ascribed to the private-cable exemption. Petitioners' argument, here, is that the phrase "under common ownership, control, or management" should be read to mean that, as long as each apartment building is *itself* under common ownership, control or management, the *complex* of buildings need not be commonly owned, controlled or managed. The problem with this reading of the private-cable exemption is that it completely distorts the literal terms of the statute.

Because the plain language of § 602(6) covers *external, quasi-private* SMATV, legislative history has little weight.[9] As we stated in *American Civil Liberties Union v. FCC*, 823 F.2d 1554 (D.C.Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988): "The general interpretive principle—a reluctance to rely upon legislative history in construing an *unambiguous* statute—is of especial force where, as here, resort to legislative history is sought to support a result *contrary* to the statute's express terms." 823 F.2d at 1568 (emphasis in original). To be sure, this interpretive principle does not apply if "the plain language of the statute would lead to blatantly absurd consequences." *Avco Corp. v. United States Dep't of Justice*, 884 F.2d 621, 624 (D.C.Cir.1989) (internal quotations omitted). But the plain reading of § 602(6) involves no "blatant absurdity." Another provision of the Cable Act, § 621(e), makes clear that the language of § 602(6) was not inadvertent:

> Nothing in this [Act] shall be construed to affect the authority of any State to license or otherwise regulate any facility or combination of facilities which serves only subscribers in one or

---

**9.** Petitioners also argue that the structure of the Cable Act precludes the FCC's interpretation of § 602(6), or at least makes that provision ambiguous. However, their argument is frivolous. First, they point to § 621(a)(2), which states that "[a]ny franchise shall be construed to authorize the construction of a cable system over public rights-of-way." 47 U.S.C. § 541(a)(2) (1988). But this provision surely does not imply or require that cable systems use rights-of-way.

Second, petitioners claim that § 621(a)(3), the "redlining" provision, requires the cable operator to wire an entire community. In *American Civil Liberties Union v. FCC*, 823 F.2d 1554 (D.C.Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988), we specifically rejected this claim: "The [provision] on its face prohibits discrimination on the basis of income; it manifestly does not require universal service." 823 F.2d at 1580.

more multiple unit dwellings under common ownership, control, or management and which does not use any public right-of-way.

47 U.S.C. § 541(e) (1988). And the plain reading of § 602(6) is made fully intelligible by the regulatory history predating the Cable Act, which we described in section I. *supra.* The presence of "external" wires, interconnecting separately-owned buildings, had long been a defining characteristic of "cable systems." *See City of New York v. FCC,* 486 U.S. 57, 66–70, 108 S.Ct. 1637, 1643–45, 100 L.Ed.2d 48 (1988) (relying on regulatory background of Cable Act to interpret statutory provision).

Nor is this that "rare case[ ] in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters," as demonstrated by "some clear indication of congressional intent ... in the legislative history." *Consolidated Rail Corp. v. United States,* 896 F.2d 574, 578 (D.C.Cir.1990) (internal quotations omitted). First, there is legislative history that supports the FCC. Section 634, the equal employment opportunity provision, states that "[f]or purposes of this section, the term 'cable operator' includes any operator of any satellite master antenna television system." 47 U.S.C. § 554(h)(1) (1988). The House committee report notes: "Subsection (h) provides that operators of satellite master antenna television systems (SMATV) are subject to the requirements of this section, whether or not such systems only serve commonly owned apartment units without crossing public rights of way." H.REP. No. 934, 98th Cong., 2d Sess. 93 (1984), U.S.Code Cong. & Admin.News, p. 4730 (*"House Report "*). This passage implies that § 602(6) does not exempt *external, quasi-private* SMATV systems.

Petitioners adduce other excerpts from the legislative history; however, these excerpts are at best ambiguous. In general, petitioners fail to distinguish between the "core" meaning of terms like "cable television" or "SMATV," and less paradigmatic meanings. The core meaning of "cable television" is a system that interconnects an entire locality, transecting local rights-of-way. *See* 129 CONG.REC. 15,590 (1983) (statement of Senator Hollings during Cable Act debate) ("[cable] cannot operate without crossing city streets"). The core meaning of "SMATV" is a system located wholly on private property, serving a single building or a commonly-owned complex. *See* S.REP. No. 67, 98th Cong., 1st Sess. 18–19 (1983) (*"Senate Report "*) ("The second exemption [in the Senate's version of § 602(6) ] is for a facility ... that serves only subscribers in one or more [multiple-unit] dwellings under common ownership, control, or management. These are the so-called private cable systems, or master antenna television (MATV) or satellite master antenna television (SMATV) systems."). General descriptions of Congress' purpose that contrast "cable" with "SMATV"—for example, the statement in the *Senate Report* that "cable faces major competition from such sources as MDS, MATV, SMATV, DBS, STV, television, radio ... and other media" [10]—surely use the two terms in their core meanings. And even specific commentary on § 602(6)(B) may be interpreted as using the core meaning of "SMATV." The *House Report* specifies:

> There are four specific exemptions to the term 'cable system' ... [*inter alia*] a facility or combination of facilities that serves only subscribers in one or more multiple unit dwellings (in other words, a satellite master antenna television system), unless such facility or facilities use a public right-of-way....

*House Report* at 44, U.S.Code Cong. & Admin.News, p. 4681. The foregoing excerpt arguably might support petitioners. However, it is also possible that the phrase "under common ownership, control, or management" was omitted inadvertently, or assumed to be part of the definition of a

---

**10.** *Senate Report* at 30; *see also id.* at 5 (similar contrast between "cable" and "SMATV"); *House* Report at 22 (same); *id.* at 22–23 (same).

"satellite master antenna television system." [11]

In short, the express terms of the Cable Act cannot reasonably be construed to exempt *external, quasi-private* SMATV facilities. The definitional clause of § 602(6) plainly covers such facilities; the private cable exemption, § 602(6)(B), plainly does not. This plain meaning is neither absurd, nor contradicted by the legislative history. Thus, we must consider petitioners' constitutional challenges.

### B. *The Constitutional Challenges*

#### 1. *First Amendment*

■ At the outset, we acknowledge that a First Amendment problem is posed. "Cable television … is engaged in 'speech' under the First Amendment," *Leathers v. Medlock,* — U.S. —, 111 S.Ct. 1438, 1442, 113 L.Ed.2d 494 (1991), and § 621(b)(1) imposes a burden on that speech. Respondents argue that the provision is no burden at all—that it merely *permits* local franchising—but this argument is unpersuasive. By its plain language, § 621(b)(1) creates an obligation for cable operators. As the Commission itself has stated, "[s]ection 621(b)(1) of the Cable Act requires that a firm seeking to construct and operate a cable television system must first obtain a franchise from the state government or its local designate." *In re Competition,* 5 F.C.C.Rcd. 362, 366 (1989); *see also House Report* at 59, U.S.Code Cong. & Admin.News, p. 4696 ("[u]nder subsection 621(b), no cable operator may provide cable service without a franchise issued by a state or a franchising authority"); *Senate Report* at 19 ("[Senate version of § 621(b)] provides that no cable system shall provide … cable service without a cable franchise"). Thus, by virtue of § 621(b)(1), the Cable Definition Rule obliges petitioners to obtain local franchises for their *external, quasi-private* SMATV systems.

However, as respondents correctly argue, neither the FCC nor Congress has fully *defined* this obligation. The Cable Act creates a franchise requirement, but gives localities broad discretion to determine the substance and process of franchising. The Act permits but does not require exclusive franchising: "A franchising authority may award … 1 or more franchises within its jurisdiction." 47 U.S.C. § 541(a)(1) (1988); *see also House Report* at 59 ("[t]his provision grants to the franchising authority the discretion to determine the number of cable operators to be authorized to provide service in a particular geographic area"); *In re Competition,* 5 F.C.C.Rcd. at 366 (Cable Act "allows, but does not require, the franchising authority to grant more than one franchise to serve the same community"). Similarly, the Act does not generally require that localities impose special duties on franchisees,[12] but simply permits localities to regulate cable rates, *see* 47 U.S.C. § 543 (1988), set aside public channels, *see id.* § 531, or levy a franchise fee, *see id.* § 542. And, in general, the statute gives only minimum specifications for franchising procedures.[13] In short, a locality could adopt a summary process for franchising *every external, quasi-private* SMATV facility, and local SMATV operators could discharge their

11. Similarly, the *House Report* states: "Section 621(e) clarifies that this bill does not affect the authority of a state or political subdivision to license or regulate an SMATV system which does not use public right[s]-of-way." *House Report* at 63, U.S.Code Cong. & Admin.News, p. 4700. Again, the omission of "under common ownership, control, or management" could be inadvertent, or the statement could be using the core meaning of "SMATV system."

12. One exception is the "redlining" provision: "In awarding a franchise or franchises, a franchising authority shall assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides." 47 U.S.C. § 541(a)(3) (1988).

13. Section 626 does partially specify a procedure for franchise renewals. *See* 47 U.S.C. § 546 (1988). However, subsection (h) states that "[n]otwithstanding [these specifications], a cable operator may submit a proposal for the renewal of a franchise pursuant to this subsection at any time, and a franchising authority may, after affording the public adequate notice and opportunity for comment, grant or deny such proposal at any time." *Id.* § 546(h). Section 625 partially specifies a procedure for franchise modifications. *See* 47 U.S.C. § 545 (1988).

§ 621(b)(1) obligation by complying with this process. Such a franchising regime would pose very different First Amendment problems than a costly, exclusive-franchising system.

■ Because localities have discretion to define the § 621(b)(1) duty, and because the justification for that duty will depend on local facts, petitioners' First Amendment challenge is unripe. We test the ripeness of this facial, pre-enforcement challenge to an agency action by balancing two factors: the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Abbott Lab. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).[14]

In this case, our treatment of the "fitness" question is similar to the standard treatment of a facial challenge where the federal agency itself has discretion. As we noted in *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931 (D.C.Cir. 1986), a "facial, purely legal challenge is both more difficult and less worthwhile when the prescription challenged is discretionary. To hold the provision invalid on its face, a court would have to conclude that the provision stands in conflict with the statute regardless of how the agency exercises its discretion." *Id.* at 941. Here, it is localities that have the discretion, not the FCC, but the same principle applies. In short, we "believe that judicial appraisal" of the First Amendment issue "is likely to stand on a much surer footing in the context of a specific application of [the Cable Definition Rule] than could be the case in the framework of the generalized challenge made here." *Toilet Goods Ass'n v. Gard-*

*ner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967).[15]

First, we will benefit from postponing review until an as-applied challenge because the First Amendment analysis depends on the local franchising regime. Different regimes will impose different burdens, which may or may not be justifiable under the First Amendment. Moreover, the judicial standard for evaluating the justification will vary with the regime. This standard depends on:

> whether, in the case of a regulation of activity which combines expressive with nonexpressive elements, the regulation aims at the activity or the expression; whether the regulation restricts speech itself or only the time, place, or manner of speech; and whether the regulation is in fact content-based or content-neutral.

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,* — U.S. ——, 112 S.Ct. 501, 514–15, 116 L.Ed.2d 476 (1991) (Kennedy, J., concurring in judgment) (citations omitted). A particular local franchising system may impose only an "incidental" burden on the speech of SMATV operators, and thereby trigger the so-called *O'Brien* test, *see United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968); or, alternatively, the franchising system may impose "direct" burdens that require stricter First Amendment scrutiny. *Cf. Century Communications Corp. v. FCC,* 835 F.2d 292, 298 (D.C.Cir.1987) (declining to decide "precise level of first amendment protection due a cable television operator," and applying *O'Brien* as minimum standard), *clarified,* 837 F.2d 517 (D.C.Cir.), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d

**14.** "Generally, in ascertaining whether a suit is ripe, courts must balance the petitioner's interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Payne Enters. v. United States,* 837 F.2d 486, 492 (D.C.Cir. 1988) (internal quotation omitted). And, "under the ripeness doctrine, the hardship prong of the *Abbott Laboratories* test is not an independent requirement divorced from the consideration of the institutional interests of the court

and agency." *Id.* at 493. Thus, if a "matter is clearly fit to be heard, we need not consider whether petitioners would suffer any hardship from our postponing its resolution." *Consolidated Rail Corp. v. United States,* 896 F.2d 574, 577–78 (D.C.Cir.1990).

**15.** Although a First Amendment overbreadth challenge would not be context-dependent, petitioners have not presented such a challenge. We offer no views on the likely success of such a challenge.

602 (1988); *Quincy Cable TV v. FCC,* 768 F.2d 1434, 1454 (D.C.Cir.1985) (same), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986).

Second, the court reviewing an as-applied challenge will have specific information about the local conditions that might justify SMATV franchising. "[W]hether the means chosen are congruent with the desired end" for purposes of *O'Brien* or a stricter First Amendment test is a "delicate fact-bound issue." *Century Communications,* 835 F.2d at 298. In *City of Los Angeles v. Preferred Communications,* 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986), a disappointed applicant for a cable television franchise had sued Los Angeles, claiming that the city's exclusive-franchise regime violated the First Amendment. The Supreme Court allowed the applicant to pursue his complaint, but refused to reach the merits of the First Amendment issue without further factual development.

> The City has adduced essentially factual arguments to justify the restrictions on cable franchising imposed by its ordinance, but the factual assertions of the City are disputed at least in part by respondent. We are unwilling to decide the legal questions posed by the parties without a more thoroughly developed record of proceedings....

*Id.* at 494, 106 S.Ct. at 2037.

To be sure, the "fitness of the issues for legal decision" is only the first factor in the *Abbott Laboratories* calculus. If, as here, we find a case unfit for review, then we must weigh the "hardship to the parties of withholding court consideration." Hardship depends, in part, on whether the Cable Definition Rule is "interpretative" or "substantive." *See ACLU,* 823 F.2d at 1576–79. Assuming, *arguendo,* that the rule is substantive, it has a direct effect on petitioners' "primary conduct." *Toilet Goods,* 387 U.S. at 164, 87 S.Ct. at 1524. The operators of *external, quasi-private* SMATV facilities may well submit to local franchising so as to avoid federal enforcement action.

"The paradigmatic hardship situation is where a petitioner is put to the choice between incurring substantial costs to comply with allegedly unlawful agency regulations and risking serious penalties for noncompliance." *Natural Resources Defense Council v. EPA,* 859 F.2d 156, 166 (D.C.Cir.1988). Here, noncompliance entails a risk of civil or even criminal penalties. *See* 47 U.S.C. § 503 (1988) (forfeiture penalty for violating title 47, chapter 5); *id.* § 501 (1988) (criminal penalty for violating title 47, chapter 5).

On the other hand, it is unclear whether petitioners will incur "substantial" costs by franchising their systems, because the cost depends on the local franchising regime. Any regime will impose some burden on petitioners' speech, and that *is* a higher "cost" for purposes of *Abbott Laboratories* than mere monetary expense,[16] but the First Amendment burden may be "incidental." Moreover, it is possible that petitioners might avoid the Hobson's choice between compliance and the risk of enforcement by bringing an anticipatory, as-applied challenge. Since the First Amendment issue is wholly unfit for judicial decision, petitioners' hardship is not so substantial as to require immediate decision. On balance, their First Amendment challenge is unripe.

### 2. *Equal Protection*

Petitioners also raise a Fifth Amendment equal protection challenge to the Cable Definition Rule. They claim that the franchising requirement for *external, quasi-private* SMATV fails the "fundamental rights" equal protection scrutiny accorded statutes infringing speech, *see, e.g., Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972); and, in the alternative, that the requirement fails the economic "rational basis test," *see, e.g., Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981). Under either test, petitioners argue, there is no adequate justifi-

---

**16.** *See United Christian Scientists v. Christian Science Bd. of Directors,* 829 F.2d 1152, 1160 n. 29 (D.C.Cir.1987) (*Abbott Laboratories* hardship "is especially pressing here in view of the fact that the activity inhibited involves not merely business but also speech and religious exercise").

cation for discriminating between *external, quasi-private* SMATV and the exempted *internal* and *wholly private* facilities.[17]

■ At this point, it appears that the distinction in the Cable Act between *external, quasi-private* SMATV and the exempted facilities may violate the minimal equal-protection test. As noted below, we will direct the FCC to consider whether some "rational basis" justifies the distinction. If the FCC is unable to provide a "rational basis," then we will decide without more that the Cable Definition Rule violates the equal protection component of the Fifth Amendment. However, if the FCC *does* furnish a "rational basis," and we conclude that the Cable Definition Rule satisfies the minimal test, we will need to consider whether a heightened-scrutiny equal protection challenge is ripe. For now, however, we need not address the "fundamental rights" claim, because the "rational basis" claim is ripe and apparently valid.

Unlike petitioners' First Amendment claim, the "rational basis" claim does not depend on particular circumstances. First, the *standard* for evaluating that claim does not vary with local conditions. "At the minimum level, this Court consistently has required that legislation classify the persons it affects in a manner rationally related to legitimate governmental objectives." *Schweiker,* 450 U.S. at 230, 101 S.Ct. at 1080. Whatever the features of the local franchising regime—whether it

imposes an "incidental" or "direct" burden on petitioners—the exemption for non-burdened facilities must meet this minimum standard.

Second, the *application* of that standard is also context-invariant. If some *external, quasi-private* SMATV operator were to raise an as-applied, rational-basis challenge to local franchising, the relevant question would *not* be whether SMATV franchising was "rationally related to a legitimate government purpose" *in that locality.* Rather, the reviewing court would seek some rational relation *as a general matter.* "Insistence on a tight fit between legislative means and ends is called for only when Congress acts along suspect (or semi-suspect) lines or in contravention of fundamental liberties...." *Women Involved in Farm Economics v. USDA,* 876 F.2d 994, 1004 (D.C.Cir.1989), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990). The rational-basis test permits "general rules ..., even though such rules inevitably produce seemingly arbitrary consequences in some individual cases." *Id.* at 1007 (internal quotation omitted); *see also* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 16–4 (2d ed. 1988) (test may permit "overinclusiveness" and "underinclusiveness").

■ Thus, the rational-basis claim is "purely legal" for purposes of *Abbott Laboratories,* and we reach the merits.[18] *Cf. Preferred Communications,* 476 U.S. at

---

17. We cannot avoid the equal protection challenge, because the Cable Act cannot reasonably be construed to define *wholly private* facilities as "cable systems." The private cable exemption, § 602(6)(B), plainly states that a facility serving a single multiple-unit dwelling or a complex of buildings that are commonly owned, managed or controlled is not a "cable system" unless the facility uses a right-of-way. We need not decide at this point whether *internal* facilities that are *not wholly private* (*e.g.,* a MDS facility serving a group of separately-owned, controlled and managed buildings) might be "cable systems" under a reasonable construction of § 602(6). *DeBartolo* will require us to address that question only if the FCC provides a "rational basis" for the distinction between *external, quasi-private* SMATV and *wholly private* facilities, but not between *external, quasi-private* SMATV and *internal* facilities.

18. Where an issue is "fit for judicial decision," we need not evaluate the "hardship to the parties," but rather proceed directly to the merits. *See, e.g., American Petroleum Inst. v. EPA,* 906 F.2d 729, 739 n. 13 (D.C.Cir.1990).

We acknowledge that the as-applied, rational-basis challenge might depend on the *kind* of local franchising regime. Conceivably, the exemption of MDS, single-building SMATV and other such facilities from one kind of franchising regime would pass rational-basis scrutiny, while their exemption from another kind would not. However, this possibility seems too speculative to justify deferring review, since we are hard pressed to imagine why *any* kind of discriminatory franchising system is justified. *See* ALEXANDER M. BICKEL, THE LEAST DANGEROUS BRANCH: THE SUPREME COURT AT THE BAR OF POLITICS 135 (Yale Univ.Press 1986) (1962) (ripeness "depend[s] on at least an initial judgment of the merits").

495–96, 106 S.Ct. at 2038–39 (implying that Court would not have needed fuller factual development for rational-basis challenge to cable franchising); *Pennell v. City of San Jose*, 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (in facial challenge to local rent control ordinance, finding "takings" claim unripe, but equal protection claim ripe).

On the record before us, we fail to see a "rational basis" for franchising *external, quasi-private* SMATV but not *internal* and *wholly private* systems. The fact that cable television uses public rights-of-way has been the predominant rationale for local franchising. As the FCC stated in promulgating the Cable Definition Rule: "The dual federal-local jurisdictional approach to regulating cable television service is largely premised on the fact that cable systems necessarily involve extensive physical facilities and substantial construction upon and use of public rights of way in the communities they serve." *In re Definition of a Cable Television Sys.*, 5 F.C.C.Rcd. 7638, 7639 (1990). The FCC articulated this rationale throughout the pre-Cable Act period. *See, e.g., Cable Television Report & Order*, 36 F.C.C.2d 143, 207 (1972) ("persuasive argument[ ] against federal licensing" is that "cable makes use of [local] streets and ways"); *In re Amendment of Part 76*, 54 F.C.C.2d 855, 861 (1975) ("ultimate dividing line [between local and federal cable regulation] ... rests on the distinction between reasonable regulations regarding use of the streets and rights-of-way and the regulation of the operational aspects of cable communications"); *Orth-O-Vision*, 82 F.C.C.2d at 183 (citing 1972 report); *Earth Satellite Communications*, 95 F.C.C.2d at 1235 (same). And Congress did the same in promulgating the Cable Act. *See Senate Report* at 7 (Senate bill "seeks to restore the jurisdictional boundaries over cable to their more traditional positions," with the " 'ultimate dividing line ... [resting on cable's] use of the streets and rights-of-way' ") (quoting 1975 report); 129 Cong.Rec. 15,590 (1983) ("[n]o one can doubt that localities should be able to exert some control over cable because it crosses public rights of way") (Senator Hollings).

However, this right-of-way rationale does not explain the distinction between *external, quasi-private* SMATV and *internal* or *wholly private* facilities, because none of the three use public rights-of-way. Nor do the congressional reports and debates on the Cable Act articulate an explanation. We assume without deciding that minimum equal protection scrutiny requires only a "conceivable basis," not an "articulated basis." *See Women Involved in Farm Economics*, 876 F.2d at 1005 n. 7. Nonetheless, we are unable to imagine *any* basis for the distinction.

▮ Rather than vacating the Cable Definition Rule, we direct the FCC to address the rational-basis issue. "[I]t may sometimes be appropriate to resort to extra-record information to enable judicial review [of agency action] to become effective." *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989). Where this court "needs more evidence to enable it to understand the issues clearly," *id.*, we have discretion to supplement an administrative record. In the instant case, we require additional "legislative facts" concerning the distinction between *external, quasi-private* SMATV and the video transmission facilities exempted by the Cable Definition Rule. *See* 3 Kenneth Culp Davis, Administrative Law Treatise 175–77 (2d ed. 1980) (courts should in some instances remand to agencies for legislative factfinding on constitutional issues); *cf. National Wildlife Fed'n v. ICC*, 850 F.2d 694, 702–08 (D.C.Cir.1988) (remanding for reconsideration of "takings" issue that agency had inadequately addressed). Thus, we direct the FCC to consider within 60 days whether there is some "conceivable basis" for requiring local franchising of *external, quasi-private* SMATV facilities but not *wholly private* or *internal* facilities.

III. Conclusion

The Cable Act plainly defines an *external, quasi-private* SMATV facility as a "cable system." Petitioners' First Amendment challenge to the local franchising of *external, quasi-private* SMATV is unripe, but we reach the merits of their equal

protection challenge. The FCC is directed to consider within 60 days whether there is some "rational basis" for a distinction between *external, quasi-private* SMATV and those facilities that the FCC has ruled exempt from local franchising. Accordingly, the record is hereby remanded.

MIKVA, Chief Judge, concurring in part and concurring in the judgment:

"In cases where a classification burdens neither a suspect group nor a fundamental interest," the Supreme Court recently reminded us, " 'courts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws.' " *Gregory v. Ashcroft,* —— U.S. ——, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991) (quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979)). Although I concur in most of my colleagues' opinion, I do not join section II(B)(2), the section addressing petitioners' equal protection challenge, because I think it shows too little reluctance to overturn complex economic legislation under the minimal rational-basis test.

To my colleagues, the FCC's distinction between different types of SMATV systems—a distinction, I agree, that is required by the plain meaning of the Cable Act—"poses a serious constitutional problem." Maj. op. at 977. It "may violate the minimal equal-protection test," maj. op. at 986; indeed, the equal-protection claim is "apparently valid." Maj. op. at 986. Although acknowledging that petitioners' challenge must fail if the law rests on a "rational basis," my colleagues see nothing "[o]n the record before us" to sustain the challenged distinction, maj. op. at 987, and are "unable to imagine *any* basis for the distinction," maj. op. at 987, a point they repeat for emphasis, *see* maj. op. at 986 n. 18. My colleagues remand so that the FCC can provide a justification for the distinction, but their strong language might suggest that no justification will satisfy them.

Such a conclusion would, in my view, mark a new and unfortunate turn in rational-basis review. The Constitution is a blueprint for a workable government, and

"[w]e must remember," as Justice Holmes wrote, "that the machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. v. Pinson,* 282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482 (1931). When Congress and state legislatures confront complex problems, interest groups and experts push many different, frequently incompatible, solutions. The democratic process—politics, if you will—often denies legislatures the option of picking the theoretically *correct* outcome, leaving them to strive for the *best possible* outcome under the circumstances. Because the only alternative would be to discourage legislators from making even an attempt to address complicated social and economic problems, the Constitution wisely permits legislative bodies to piece together practical plans— "rough accommodations," as the Supreme Court put it long ago, "illogical, it may be, and unscientific." *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 443, 57 L.Ed. 730 (1913). Undoubtedly, the political process sometimes gets it wrong, but the Constitution presumes that, as long as the groups involved have a fair chance to fight in the political arena, the democratic process will right itself. Legislatures may change flawed laws, or voters may even "throw the bums out." The Constitution reserves judicial review for situations where one may suspect the democratic process. It forbids the judiciary from "sit[ting] as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976).

None of that is new, of course, and I doubt that my colleagues disagree with the background. But I think we should keep that background in mind as we engage in constitutional scrutiny under the rational-basis test. Under that test, legislatures may single out classes of people as long as the lines drawn are not " 'invidious or irrational.' " *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 176, 101 S.Ct.

453, 460, 66 L.Ed.2d 368 (1980) (citation omitted). "A classification having some reasonable basis does not offend [equal protection principles] merely because it is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911) (quoted in more than two-dozen Supreme Court cases including, most recently, *City of Dallas v. Stanglin*, 490 U.S. 19, 26, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989)). Accordingly, the Supreme Court has struck down only a handful of statutes under the rational-basis test; even the *Lochner* Court rarely invoked equal protection principles to invalidate economic legislation. And almost every law declared unconstitutional under rational-basis review involved a class of people who, for one reason or another, faced obstacles to their participation in the political process that produced the challenged law—such as the mentally retarded, *see City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); children of illegal aliens, *see Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); or out-of-state companies challenging a state law that "discriminat[ed] against nonresident competitors," *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 875 n. 5, 105 S.Ct. 1676, 1680 n. 5, 84 L.Ed.2d 751 (1985); *see also* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 16–3 p. 1445 (2d ed. 1988) ("Th[e] sporadic move away from near-absolute deference to legislative judgments seems to be a judicial response to statutes creating distinctions among classes of residents based on factors the Court evidently regards as in some sense 'suspect' but appears unwilling to label as such.").

Not only should economic legislation be upheld as long as the classifications drawn in the statute "are reasonable in light of its purpose," *McLaughlin v. Florida*, 379 U.S. 184, 191, 85 S.Ct. 283, 287, 13 L.Ed.2d 222 (1964), but the justification for the legislation need not appear in the legislative or administrative record. As the Supreme Court has said:

> Where ... there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision," because this Court has never insisted that a legislative body articulate its reasons for enacting a statute.

*United States R.R. Retirement Bd.*, 449 U.S. at 179, 101 S.Ct. at 461 (quoting *Flemming v. Nestor*, 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960)). My colleagues "assume without deciding" that minimal equal protection scrutiny requires only a "conceivable basis," not an "articulated basis," maj. op. at 987, but I think that question is settled. The Supreme Court stated last Term that, under the rational-basis test, a "statutory distinction does not violate the Equal Protection Clause 'if any state of facts reasonably *may be conceived* to justify it.' " *Sullivan v. Stroop*, 496 U.S. 478, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990) (quoting *Bowen v. Gilliard*, 483 U.S. 587, 601, 107 S.Ct. 3008, 3017, 97 L.Ed.2d 485 (1987) (emphasis added)). My colleagues are right to search the record for possible justifications, *see* maj. op. at 986, but to the extent their opinion implies that justifications in the record are necessary or have special significance in rational-basis review, I must disagree.

Against a rational-basis challenge, I think the Cable Act comes to us bearing a very strong presumption of constitutionality, a presumption that can be sustained by justifications in or out of the record. The Cable Act is a large and complex piece of socioeconomic legislation, an effort to establish a comprehensive regulatory scheme for the cable industry, a product of public hearings, private negotiations, and compromise. SMATV operators, the petitioners in this suit, participated actively in the process and, in fact, did quite well. With only one exception—the one at issue here: SMATV systems that interconnect multiple, separately owned buildings with physical wiring on private property—SMATV facilities are excluded from Cable Act requirements. My colleagues appear to think that the challenged provision of the Cable

Act is unlikely to survive minimal equal-protection review (though I'm not sure how they can suggest that the challenged provision is absurd for purposes of constitutional analysis after holding that the FCC's reading of the provision is not absurd for purposes of statutory analysis, *see* maj. op. at 980–81). I do not share my colleagues' doubts. Perhaps rough, the distinctions in the statute strike me nevertheless as entirely reasonable in light of the Cable Act's purposes.

As I read section II(B)(2), my colleagues are troubled by two distinctions in the law. The first is between what my colleagues call "external, quasi-private" SMATV (subject, under the challenged provision, to Cable Act requirements) and "internal" SMATV (not subject, under the challenged provision, to Cable Act requirements). That distinction seems to me a reasonable way to promote the development of non-physical video delivery systems. Under the statute, a SMATV facility serving multiple, separately owned buildings is covered by the Cable Act if the broadcast signal is transmitted to the buildings through cable or other physical wiring, and exempt from the Cable Act if the broadcast signal is transmitted through the air via radio waves. (The latter system is the one my colleagues' term "internal" and, although I am happy to borrow the useful shorthand, I think it is worth noting that an "internal" system does serve multiple buildings.) The effect of the rule, as both petitioners and the FCC say, is to create an incentive for SMATV operators to switch from physical wiring to radio transmission so that they are exempt from regulation under the Act. But that, I think, is entirely consistent with Congressional and FCC policy of promoting "new technologies that offer substantial public benefits." *National Ass'n of Broadcasters v. FCC,* 740 F.2d 1190, 1197 (D.C.Cir.1984). In fact, the FCC chose to preempt local regulation of some SMATV systems in part to advance "the federal interest in 'the unfettered development of interstate transmission of satellite signals.'" *New York State Comm'n on Cable Television v. FCC,* 749 F.2d 804, 808 (D.C.Cir.1984). That same federal interest,

it seems to me, justifies the statutory distinction here. I am not at all persuaded that a classification that encourages SMATV operators to use radio-wave technology instead of cable wiring violates equal protection principles.

My colleagues also seem to be concerned about the distinction between "external, quasi-private" SMATV (subject, again, to Cable Act requirements) and "wholly private" SMATV (not subject to Cable Act requirements). I think that distinction is reasonable in light of the Cable Act's purpose of promoting consumer, or viewer, interests. Under the statute, a SMATV system on private property is covered by the Cable Act if it serves multiple buildings that are *not* commonly owned, managed or controlled, and not covered by the Act if it serves buildings that *are* commonly owned, managed or controlled. In adopting the Cable Act, Congress could have taken the reasonable position that a SMATV system serving multiple buildings not under common ownership is similar to a traditional cable system and likely to give rise to similar problems from the perspective of the viewer. Congress could have reasoned, meanwhile, that a SMATV facility serving buildings under common ownership is likely to be smaller, and the ability of residents to influence ownership likely to be greater, so that the costs of regulation could outweigh the benefits. Similarly, in adopting the SMATV provision, Congress could have concluded that regulation of facilities serving multiply owned buildings is a reasonable way to enhance the diversity of broadcast information, while SMATV systems serving buildings commonly owned are, again, likely to be smaller and not in need of regulation. The challenged classifications, in sum, pose line-drawing problems. "[A]nd the fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *United States R.R. Retirement Bd.,* 449 U.S. at 179, 101 S.Ct. at 461.

Because my colleagues mention only the public rights-of-way rationale for the Cable Act, I should note that the consumer-inter-

est and diversity-of-information rationales plainly appear on the face of the Act (along with four other stated objectives): the law is intended to "establish franchise procedures and standards which encourage the growth and development of cable systems and which *assure that cable systems are responsive to the needs and interests of the local community*", 47 U.S.C. § 521(2) (emphasis added); and it is intended to "assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public." 47 U.S.C. § 521(4). (The Act is also intended to serve the broad purpose of "establish[ing] a national policy concerning cable communications." 47 U.S.C. § 521(1).) The Cable Act provides for the regulation by franchising authorities, under certain circumstances, of cable systems' rates, services, facilities and equipment. 47 U.S.C. §§ 543–544. And it contains provisions designed to encourage diversity of information distribution, such as those authorizing franchising authorities to require that cable operators set aside a portion of their channels for public, educational and governmental access channels, 47 U.S.C. § 531, and for other programmers, 47 U.S.C. § 532.

In light of the requirements the Cable Act imposes, the Cable Definition Rule might raise First Amendment questions and it might pose problems under "fundamental rights" equal-protection scrutiny—questions, I agree with my colleagues, we need not now decide. But I think the statute does not pose serious constitutional problems under rational-basis review. The classifications in the cable definition provision, as I've suggested, are reasonable in light of the Cable Act's purposes. In fact, given the variety and scope of the statute's purposes, I am confident the FCC will suggest justifications I have not mentioned.

I do not, finally, disagree with my colleagues' decision to remand the case to the FCC so that it can provide justifications for the classifications in the statute. This is a complicated area, and the expert agency is certainly better equipped than the court to put the classifications in context. Unfortunately, when the FCC defended the Cable Definition Rule before us, it provided no explanations for the distinctions in the law. It chose not to reply to petitioners' constitutional arguments, resting on its response that the challenges were not ripe. The Commission should have done more, and my colleagues are right to demand more. I only hope that my colleagues' dicta about the merits of petitioners' rational-basis claim reflect frustration with the FCC rather than a new approach to rational-basis review.